(No. 22908.—

Frank C. Toombs, Appellant, *vs.* James Lewis, Appellee.

*Opinion filed December 19, 1935.*

GEE & GEE, ALLEN, DALBEY & FOREMAN, and JONES, GRANT & JONES, (RAY M. FOREMAN, and JOHN E. SEBAT, of counsel,) for appellant.

F. C. MESERVE, and SUMNER & LEWIS, for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

Frank C. Toombs, doing business as Frank C. Toombs & Co., (hereinafter called the plaintiff,) brought an action. in assumpsit in the circuit court of Lawrence county against James Lewis (hereinafter called the defendant) for the recovery of $2850 paid by the plaintiff to the defendant. The defense was the general issue. A jury trial resulted in a verdict for the plaintiff in the sum of $2835, with interest. Interest was remitted and judgment was entered for $2835. The defendant appealed to the Appellate Court for the Fourth District, where the judgment of the circuit court was reversed without remanding. The plaintiff's petition to this court for leave to appeal was granted, and the case is here for review.

The first count of the declaration in substance alleged that on February 21, 1932, the defendant directed the plaintiff, as a broker, to sell seventy-five units of $8 interest-bearing allotment certificates issued by the Associated Gas and Electric Company at the price of $38 a unit or better; that the plaintiff found a purchaser for the certificates at $38 per unit and notified the defendant of the completion

of the sale; that the plaintiff advanced to the defendant the full purchase price of $2850 and instructed the defendant to forward to the plaintiff the allotment certificates sold, which the defendant promised to do but failed and forwarded other allotment certificates of $1.60 interest-bearing units, which were refused by the purchaser, and the defendant refuses to tender the seventy-five units of $8 interest-bearing certificates, whereby the defendant became indebted to the plaintiff in the sum of $2850. The usual common counts in assumpsit were added.

The plaintiff was formerly an investment broker in Danville, Illinois. The defendant is a retired farmer, residing on a farm near Lawrenceville, in Lawrence county. It appears from the evidence for the plaintiff that he had in his employ a representative, Langdon R. Jewett, who made inquiries of the defendant in regard to matters not involved in this proceeding. During the course thereof the defendant consulted Jewett concerning certain correspondence he had from the Associated Gas and Electric Company with regard to a general certificate issued by that company and owned by the defendant. Jewett read the correspondence but testified he did not see the general certificate. It now appears that the certificate of the defendant was the $1.60 interest-bearing allotment certificate. It also appears that there was on the market and issued by the same company an $8 interest-bearing allotment certificate. It appears that these units were of different value. The first of these, which was afterward delivered to the plaintiff in consummation of the deal, was worth approximately $8 or $10 a share. The other, which was quoted on the exchange, was of the value of approximately $40. The confusion arises over the fact that the plaintiff believed he was obtaining the latter class of stock and not the former. Upon mention by Jewett to L. G. Gee, president of the Farmers State Bank of Lawrenceville, that he had ascertained the defendant owned the allotment certificates in question, Gee wrote

to the defendant that he could sell them and advised placing them with the plaintiff for sale at $38 a share "or better." Gee was not associated with the plaintiff's firm and testified that he acted for the defendant when he communicated with the plaintiff about the sale of the allotment certificates. Afterward, in a telephone conversation with Gee, the plaintiff stated that the allotment certificates were worth about $38 a share on the market. Gee asked the defendant if he should place them at that price, and the defendant authorized him to do so. Gee directed the plaintiff to sell the allotment certificates if he could obtain $38 or more a share for them. The plaintiff testified that Gee's instructions were to enter the order to sell at $38 a share. The plaintiff relayed Gee's instructions to the plaintiff's Chicago correspondents to make the sale at $38 a share, and they were sold but at $38.50 a share. The plaintiff sent a confirmation to the defendant in care of Gee, acknowledging the purchase from the defendant of the allotment certificates at the price of $38 a share, with a deduction of $15 brokerage commission, leaving a net total price of $2835. The plaintiff in the meantime had honored a sight draft drawn on him at Danville by Lewis for the amount of the price, quoted at $38 per share for the seventy-five certificates. Gee was then instructed to forward the allotment certificates to the Chicago brokers. The certificates were erroneously supposed to be those which were the subject of quotation of $38 a share. The plaintiff retained the difference between $38.50 and $38 a share. The certificates which the defendant forwarded were what were called $1.60 allotment certificates, having a value of only $9 or $10 a share. Upon receiving word from the Chicago brokers that the wrong certificates had been forwarded, the plaintiff instructed the Chicago brokers to return to the Farmers State Bank those which had been sent to them, with a draft attached for payment by the defendant. The plaintiff notified Gee that there was some misunderstand-

ing, and the latter immediately communicated that information to the defendant. On instructions of the plaintiff the Chicago correspondents returned the allotment certificates with a sight draft, which the defendant refused to pay. The general certificate disclosed that the units therein described were $1.60 allotment certificates, but apparently there was nothing to show that they were not the allotment certificates which were listed and quoted as having a stock market value.

The plaintiff conferred with the defendant in an attempt to have him "reverse" the transaction, and the defendant first said he would do so but later refused. The plaintiff testified that he did not purchase the certificates from the defendant but merely sold them for him, and there was evidence which might justify him in retaining the amount above the minimum price at which the defendant was willing to sell and that he was not obligated to tell the defendant that he sold the certificates for $38.50 a share. Jewett testified that the defendant admitted that before the allotment certificates were delivered to Gee he had a banker telegraph to Chicago to ascertain their value, and he was advised that they were worth only $10 a share.

The evidence on behalf of the defendant is in substance that offered by himself, supplemented by certain letters. The defendant testified that when Jewett saw him the first time the defendant told him that he had some Associated Gas and Electric Company allotment certificates which had been called. Jewett asked him why he did not sell them, and the defendant asked if there was a market for them. Jewett looked at a book which he had and said they were quoted at $42 a share. The defendant showed Jewett papers and correspondence he had concerning the allotment certificates and the latter made some computations to determine their value. The next morning the defendant received a letter from Gee stating that Jewett had informed him of the defendant's ownership of the allotment certifi-

cates, which he ought to sell. The defendant asked Gee if he knew Jewett and the plaintiff, and Gee replied that he did; that they had handled some securities for him, and they were able to obtain more for the securities than he, Gee, could obtain, and advised their sale through the plaintiff. The defendant had the allotment certificates with him and delivered them to Gee, telling him that stocks and bonds were declining rapidly, and that Jewett said the shares had been worth $42 but had declined and advised their sale at $38 a share or better. Thereafter the defendant asked Gee about the allotment certificates. The latter asked for the defendant's bank book and entered in it the amount of $2832 as the proceeds of the sale. The defendant thereafter talked with the plaintiff, who claimed he was only the defendant's agent, and also talked with Jewett. They wished him to take the allotment certificates back, but he refused to do so and refused to refund the money he had received for them. Gee had also told him that they (meaning the plaintiff and Jewett) desired the money refunded. The defendant never told anyone whether the allotment certificates were $8 or $1.60 interest-bearing units and made no representations to anyone about them. He testified that when he purchased the allotment certificates for $27 a share no explanation was made to him other than that they were allotment certificates, and he did not know there were two kinds or that they were listed each day. He delivered his allotment certificates to Gee and told him to "send them in at $38 or better," without specifying to whom they should be sent, and that the market was dropping rapidly. He testified that he supposed the brokers would obtain the best price they could and take all their commission. Before he delivered the allotment certificates to Gee the defendant had talked with one Madding, who appears to be a banker, who said the value of the shares was very low, being worth only about $10 a share. He did not discuss with Madding $8 interest-bearing certifi-

cates, and did not remember telling Madding that Jewett said they were worth $42 a share. On cross-examination the defendant admitted that he had dealt in different kinds of securities, and that while he had some experience in their purchase and sale, such transactions had not been through brokers.

The principal questions presented are, first, whether the plaintiff was acting as agent for the defendant in the sale of the allotment certificates in question; and second, whether a mistake in the identity of the allotment certificates was made, without negligence on the part of the plaintiff, which would have prevented the completion of the transaction if the facts had been known. The defense here is that the transaction was one of bargain and sale and that the rule of *caveat emptor* is controlling, and that the defendant cannot be required to restore to the plaintiff the proceeds of the transaction.

Evidence offered by the plaintiff fairly tended to show the relationship of principal and agent. When the allotment certificates were the subject of discussion or written communication in the inception of the transaction, Gee, the president of a bank, who apparently was disinterested although he was the defendant's banker, advised the defendant that he thought the plaintiff and Jewett could obtain more for his allotment certificates than the defendant himself could realize. Gee did not write or say that the plaintiff would purchase the allotment certificates, and there is nothing in the earliest inquiries or statements concerning the securities to indicate that the defendant understood that the plaintiff himself would purchase them but they were merely to be placed with him for sale. While the plaintiff advanced the purchase price of the allotment certificates for the defendant, and there was some wording in the confirmation sent by the plaintiff's stenographer to the defendant which, if standing alone, might indicate that the plaintiff was acknowledging the purchase by the

plaintiff's firm, such wording appears in the formal part of the confirmation. When the defendant authorized Gee to "send in" the certificates, he testified that he supposed the brokers would obtain all they could for the allotment certificates, and the defendant, at the Farmers State Bank at the time of the entry of the proceeds of the sale in his bank book, inquired, "They sold the certificates?" and Gee replied in the affirmative. There is evidence that the defendant knew that a commission was being charged by the plaintiff. The plaintiff positively testified that he was acting as an agent and not as a purchaser, and there is corroborative evidence in support of this contention.

If the relationship of seller and purchaser did not otherwise exist but that of principal and agent did, the formal wording in the confirmation, and the retention by the plaintiff of the difference between $38 and $38.50 a share upon a sale of the allotment certificates, would not necessarily, as a fact or under a rule of law, convert the relationship of principal and agent into one of seller and purchaser. According to the testimony of Gee the defendant authorized the sale of the allotment certificates at $38 a share or better. We do not pass upon the propriety of the plaintiff's action, which he testified was justified by the practice of brokers, in retaining the amount above $38 a share, but hold, only, that it did not create a new relationship between the parties. It was the province of the jury to pass upon all questions of fact. The plaintiff, in whose favor the jury found, is entitled to the benefit of all the facts which the evidence tends to prove and all just inferences that can be drawn therefrom, and the evidence most favorable to him must be taken as true. *Pollard* v. *Broadway Central Hotel Corp.* 353 Ill. 312; *Molloy* v. *Chicago Rapid Transit Co.* 335 id. 164.

It might be gathered from the testimony that the plaintiff, Jewett and Gee each assumed the allotment certificates as to which they were negotiating were such as were quoted

as $38 or more per share. Jewett expressed some doubt to the defendant concerning his ability to know the real facts from the data shown him, when the latter requested his opinion as to the value of the allotment certificates. Neither the plaintiff nor Jewett saw the general certificate evidencing the defendant's ownership of the allotment certificates. In view of this fact, and that the defendant from another source had sought and obtained information that their actual value was $10 a share, and that he had experience in trading in securities, the evidence was of a character to require its submission to the jury on the question of the good faith of the defendant.

An action of assumpsit will lie for money had and received for the use of the plaintiff whenever, by means of a contract relation, the defendant has obtained possession of money which in justice he ought to refund. (*Arnold* v. *Dodson,* 272 Ill. 377; *Donovan* v. *Purtell,* 216 id. 629.) This is the general rule. (*Allen* v. *Mendelsohn & Son,* 207 Ala. 527; *Smith* v. *Rubel,* 140 Ore. 422.) The facts in the latter case are similar to those in this case. It was there held that the defendant (corresponding to the defendant here) had received the supposed purchase price (the brokerage firm's money) through a mistake, and that the plaintiff's action for money had and received, although an action at law, was governed by equitable principles. The fact that securities are purchased in the name of a broker entrusted with their possession and he advances the price for them is not inconsistent with the brokerage business, (*Banta* v. *City of Chicago,* 172 Ill. 204; Meyer's Law of Stock Brokers and Stock Exchanges, secs. 66, 67, 112, 132;) and such circumstances do not necessarily render the broker a purchaser.

On the evidence presented for the plaintiff the jury would be authorized in finding that the plaintiff was the agent of the defendant, and that the money advanced by the former was in law considered as paid on an implied

request of the defendant as principal and carried an implied promise to re-pay it. Meyer's Law of Stock Brokers and Stock Exchanges, sec. 112; *Perin* v. *Parker,* 126 Ill. 201; 2 Re-statement of the Law of Agency, (Am. Law Inst.) sec. 439.

We have reviewed the evidence only for the purpose of determining whether or not there is any evidence tending to establish the plaintiff's cause of action. (*Pollard* v. *Broadway Central Hotel Corp. supra.*) Having decided this question in the affirmative, the judgment of the Appellate Court is reversed and the cause is remanded to that court, with directions to consider the assignments of error other than the one here decided, and to either affirm the judgment of the trial court or to reverse the judgment and remand the cause.   *Reversed and remanded, with directions.*